Filed 7/5/13  Mack v. City of Hawthorne CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| MARJORIE MACK et al., | B238094 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC433745) |
| v. | |
| CITY OF HAWTHORNE et al., | |
| Defendants and Respondents. | |

APPEAL from orders and a judgment of the Superior Court of Los Angeles County, Elizabeth Allen White, Judge.  Affirmed.

Law Offices of David Peter Cwiklo and David Peter Cwiklo, for Plaintiffs and Appellants.

Liebert Cassidy Whitmore, Jeffrey C. Freedman and Meredith G. Karasch, for Defendants and Respondents.

# I.  INTRODUCTION

Plaintiffs, Marjorie Mack and Shannon-Joy Gossett, appeal from the trial court's orders and judgment in favor of defendant City of Hawthorne (the city).  They argue it was error to grant the city's motion for summary adjudication of their race and gender discrimination claims.  Plaintiffs also contend the trial court erred in granting the city's nonsuit motion on the retaliation claim.  In addition, plaintiffs challenge the trial court's evidentiary rulings before and during trial.  We affirm the orders and judgment.

# II.  BACKGROUND

## A.  First Amended Complaint

Plaintiffs sued the city, Jag Pathirana, Robert O'Brien, Hamid Pournamdari, Larry Guido, and Steven Romero asserting claims for:  retaliation, racial, gender and disability discrimination; hostile work environment, racial, gender, disability harassment; and intentional infliction of emotional distress.  Plaintiffs were African American female employees of the city's housing department.  Ms. Mack was a housing specialist.  Ms. Gossett was a Section 8 housing inspector.

Plaintiffs alleged the city discriminated against two other African American female employees, Cheryl Williams and Rose McKinney.  At her April 16, 2008 deposition, Ms. McKinney identified Ms. Gossett as an eyewitness to the city's racial discrimination and retaliation against African American females.  In June 2008, the city, through fraud investigator Roberto Chavez, began investigating plaintiffs for fraud and misconduct.  On March 17, 2009 criminal charges were filed against plaintiffs for fraudulently filing a forged Section 8 housing list and subsidiary vouchers.  On March 26, 2009, the city notified plaintiffs they would be placed on unpaid leave because the "charges relate to the core functions of [their] employment."  Plaintiffs claimed the investigation and constructive termination were based on racial, gender and disability

2

discrimination. They also alleged the city retaliated against them because they were identified as witnesses in the McKinney case.

The individual defendants were later dismissed. The only remaining defendant was the city. Plaintiffs' remaining claims were for retaliation, racial, gender, and disability discrimination, and harassment.

## B. City's Motion for Summary Adjudication

On June 16, 2011, the city filed a motion for summary adjudication on the retaliation, race, gender, and disability discrimination, and harassment claims. The city argued plaintiffs failed to establish a causal connection between a protected activity and the adverse employment action. Also, the city contended there was no causal connection between plaintiffs' race, disability or gender and the city's investigation and suspension. The city argued it had a legitimate non-discriminatory reason to investigate plaintiffs and place them on administrative leave. The city argued: Mr. Chavez and Mr. Romero investigated plaintiffs based on a complaint from Rene Mayorga, a member of the public, and not by unlawful animus; the investigators determined plaintiffs manipulated the Section 8 waiting list in an illegal conspiracy to mutually exchange subsidized housing benefits; Ms. Mack was negligent in her job; and Ms. Gossett filed an inspection report on a friend's apartment which she did not inspect. Furthermore, the district attorney's office separately filed criminal charges against plaintiffs. Mr. Pathirana and Mr. O'Brien placed plaintiffs on administrative leave only after criminal charges were filed against plaintiffs. The city argued the criminal charges filed against plaintiffs by the district attorney's office showed plaintiffs' suspension was not arbitrary. In addition, the city contended plaintiffs could not establish harassment because personnel decisions did not constitute harassment.

In support of its summary adjudication motion, the city submitted the declaration of Roberto Chavez. Mr. Chavez was the city's Section 8 housing fraud investigator from mid-2007 until September 2010. On June 26, 2008, Mr. Chavez received a voicemail

3

from Rene Mayorga who reported that his girlfriend was violating the rules for her subsidized housing. Mr. Chavez telephoned Mr. Mayorga back the same day. Mr. Mayorga stated "Madric Mack" was accepting $500 gift cards in exchange for moving clients up on the waiting list. Mr. Chavez reported his conversation with Mr. Mayorga to Hawthorne Police Sergeant Steven Romero.

Mr. Chavez questioned Mr. Mayorga's motive so he conducted a further investigation. Mr. Chavez reviewed the current waiting list for the Section 8 housing vouchers and noticed Mr. Mayorga, his girlfriend, and members of his girlfriend's family had all received Section 8 rent subsidy vouchers. They were all listed close together and close to the top of the waiting list. Mr. Chavez believed the timing was suspicious because they had applied in April 2007 and received benefits by November 2007. In Mr. Chavez's experience, applicants typically waited for many years before receiving Section 8 housing benefits.

Mr. Chavez, his colleague, Guido Fernandez, and Sergeant Romero interviewed Mr. Mayorga's girlfriend, Idalia Linares. Ms. Linares stated her aunt and apartment manager, Carolina Hernandez, told her to give Ms. Mack a gift card and Ms. Mack would "hook her up." Ms. Linares stated Shannon Gossett knew what was going on and inquired whether Ms. Linares had given a gift card to Ms. Mack. Ms. Hernandez told Ms. Linares that Ms. Linares' mother, grandmother, and the assistant manager of the apartment, Herlinda Gonzalez, were all giving Ms. Mack gift cards to get Section 8 housing benefits. Ms. Gonzalez, stated Ms. Hernandez told her "Ms. Mack was going to hook them up." At the time Ms. Hernandez and her relatives applied for benefits, Ms. Mack was in charge of the Section 8 housing eligibility list. Ms. Gossett assisted Ms. Mack with the Section 8 housing list.

Ms. Mack admitted during an interview with Sergeant Romero and Mr. Chavez that her daughter lived in an apartment complex managed by Ms. Hernandez that was subsidized by the Southern California Housing Development Corporation. Ms. Hernandez managed the waiting list for Southern California Housing Department Corporation. Ms. Gossett admitted in an interview with Sergeant Romero and Mr.

4

Chavez that she sent a rental application to Ms. Hernandez on behalf of her husband. She sent the application on the city's fax cover sheet while conducting an inspection of Ms. Hernandez's apartment building. Her husband was in a psychiatric ward at the time Ms. Gossett submitted the application.

Mr. Chavez audited Ms. Mack's case files and found various discrepancies. In particular, Mr. Chavez found discrepancies in Safiu Sanusi's file. Mr. Sanusi was the brother-in-law of Peter Ojo, a former city housing specialist who was Ms. Mack's friend. Mr. Sanusi failed to update his application by September 30, 2006 but he was not removed from the Section 8 waiting list. Although Ms. Mack sent a letter notifying Mr. Sanusi that he had been selected for Section 8 benefits on October 30, 2006, Mr. Sanusi did not submit his application until October 31, 2006. Ms. Mack issued Mr. Sanusi a voucher on November 2, 2006 without conducting the required background or credit report check. Ms. Mack allegedly did not complete a background check on Mr. Sanusi until after her meeting with Mr. Chavez and Mr. Pournamdari in January 2007.

At the time Mr. Sanusi received his voucher, he was number 408 on the Section 8 waiting list. Many other applicants who were ahead of Mr. Sanusi on the Section 8 waiting list were skipped over by Ms. Mack. One applicant, Sheryl Miller, applied for section 8 benefits on January 30, 2004 and was number 29 on the September 13, 2006 waiting list. Ms. Miller received a December 8, 2006 letter from Ms. Mack notifying her that she was number 76 on the waiting list. Ms. Mack informed Ms. Miller that she likely would be on the waiting list for five years.

Mr. Chavez also investigated Ms. Gossett concerning her failure to inspect a Section 8 apartment. An apartment owner, Jacqueline Kelly, reported Ms. Gossett did not inspect the unit she owned before it was leased to Andrea Simpson, the sister of Ms. Gossett's boyfriend. Also, Mr. Chavez found Ms. Simpson appeared number two on the waiting list because plaintiff entered an incorrect application submission time into the housing department's computer system.

Mr. Chavez discussed his investigation with Sergeant Romero, colleague Guido Fernandez, and housing department head Hamid Pournamdari. Mr. Chavez kept city

manager Jag Pathirana informed of the status of his investigation but did not share with him the details of the investigation. He did not discuss the investigation with human resources manager Robert O'Brien. Once Mr. Chavez and Sergeant Romero had enough evidence, they discussed the matter with Los Angeles County deputy district attorney Renee Urman. Ms. Urman later filed criminal charges against plaintiffs. Mr. Chavez was not aware of the McKinney lawsuit until well after his investigation of plaintiffs. He did not know plaintiffs were listed as witnesses in the McKinney case or that they attended Ms. Kinney's civil service commission hearing.

Besides Mr. Chavez's declaration, the city submitted a declaration from Police Lieutenant Steven Romero. During the relevant time of the investigation, he was a sergeant with the Crime Free Multi-Housing Division in the Hawthorne Police Department. Sergeant Romero worked with Mr. Chavez to investigate Section 8 housing fraud. In July 2008, he received information from Mr. Chavez that plaintiffs had committed fraud by accepting bribes from Section 8 applicants. Mr. Chavez reported Rene Mayorga stated his former girlfriend, Idalia Linares, had given Ms. Mack a gift card in exchange for a Section 8 voucher. On July 11, 2008, Sergeant Romero spoke with Ms. Linares at the Hawthorne Police Department. Ms. Linares stated her aunt Carolina Hernandez told her to give Ms. Mack a gift card to get Section 8 benefits. Ms. Linares personally spoke with Ms. Mack and agreed to give Ms. Mack a gift. But Ms. Linares later did not give Ms. Mack the gift card because she thought Ms. Mack was rude towards her.

In an interview with Sergeant Romero and Mr. Chavez, Ms. Hernandez admitted she told Ms. Linares to give Ms. Mack a gift as a token of appreciation, but not as a condition for receiving benefits. Ms. Hernandez advised Ms. Linares not to give the gift in front of others to avoid being accused of "paying off" Ms. Mack. Ms. Hernandez confirmed Ms. Mack's daughter lived in an apartment managed by Ms. Hernandez. She denied having a personal relationship with plaintiffs but admitted she invited them to lunch outings because they assisted Ms. Hernandez's tenants to receive their Section 8 benefits faster.

6

The city also submitted the declaration of Hamid Pournamdari, the director of the city's housing department. Mr. Pournamdari supervised Ms. Mack and Ms. Gossett when they worked at the housing department. He supervised and appointed Roberto Chavez as the fraud investigator in 2007 because Mr. Chavez had investigated Section 8 applicants when Mr. Chavez was a housing specialist. Mr. Pournamdari did not open the position to other applicants because the city rules permitted him to fill the position without an open recruitment process.

In 2007, Mr. Pournamdari met with Ms. Mack and Mr. Chavez about Mr. Sanusi's Section 8 voucher. Ms. Mack failed to verify bank information when issuing the voucher. Ms. Mack later provided him with the needed information. Mr. Pournamdari was not aware Mr. Sanusi was number 408 on the waiting list. Ms. Mack and Ms. Gossett complained Mr. Chavez harassed them. Mr. Pournamdari determined plaintiffs felt Mr. Chavez harassed them because Mr. Chavez checked their work. But it was Mr. Chavez's job to check and audit the work of other employees. Mr. Pournamdari was aware of two complaints concerning Ms. Gossett's failure to inspect apartment units.

In June 2008, Mr. Chavez told Mr. Pournamdari of his conversation with Rene Mayorga, a Section 8 program participant. Mr. Mayorga alleged Ms. Mack was moving people toward the top of the housing department's eligibility list for Section 8 housing in exchange for gift cards. Mr. Pournamdari asked Mr. Chavez to investigate the matter. At that time, Ms. Mack was in charge of the Section 8 waiting list and Ms. Gossett helped her with the list. Mr. Pournamdari did not speak to the district attorney's office about the investigation until the criminal complaint was filed. He also was not involved in the decision to place plaintiffs on unpaid leave.

In addition, the city submitted the declaration of Jag Pathirana in support of its summary adjudication motion. Mr. Pathirana was the city manager from 2006 through 2010. As the city manager, he was the executive director of the city's housing authority. He did not remember seeing Ms. Mack or Ms. Gossett at Ms. McKinney's civil service commission hearing. In addition, Mr. Pathirana knew about the McKinney case but was not aware plaintiffs were witnesses in that case. He has not seen the witness list in the

McKinney case, has never read Ms. McKinney's deposition, and plaintiffs never told him they were witnesses in that case. In mid-2007, Mr. Pathirana discussed creating a fraud investigator position with Mr. Pournamdari. Mr. Pournamdari suggested Mr. Chavez would be a good investigator because Mr. Chavez was already doing a significant amount of fraud investigations. Mr. Pathirana directed human resources manager Robert O'Brien to create a job description for the new position, which was later approved by the city council.

In 2008, Mr. Chavez informed Mr. Pathirana about his investigation of plaintiffs based on complaints from a member of the public. Mr. Pathirana and Mr. O'Brien reviewed Mr. Chavez's report after Mr. Chavez completed his investigation. Mr. Pathirana and Mr. O'Brien did not think there was enough evidence at that time to take disciplinary action or to go to the district attorney. But, Mr. Chavez and Sergeant Romero stated there was information they could not share that would be presented to the district attorney. Later Mr. Pathirana spoke to Police Chief Heffner and Sergeant Romero, who provided more information. After the conversation, Mr. Pathirana believed the case was strong enough to bring to the district attorney's attention. However, Mr. Pathirana never spoke to the district attorney's office about the matter. He received a copy of the criminal complaint after it had been filed. Mr. Pathirana declared he concurred with the decision to place plaintiffs on leave solely because of the job-related criminal charges filed by the district attorney's office.

The city also filed a declaration from Robert O'Brien, the city's human resources manager. Mr. O'Brien stated in 2004, his office received two Equal Employment Opportunity Commission (EEOC) complaints from a housing department employee Cheryl Williams. She alleged her supervisor, Harold Roth, had harassed, discriminated and retaliated against her. The city mediated Ms. Williams' second claim through the EEOC and reach a settlement. In November 2006, Ms. Gossett complained to the EEOC that she was not receiving pay equal to a male housing inspector. The city settled with Ms. Gossett and adjusted her salary.

8

In February 2007, Mr. O'Brien met with Ms. Gossett, Twanna Manago-Robinson and Quila Lewis. Ms. Gossett stated she had recently met Congresswoman Maxine Waters' staff to discuss the city's unfair treatment towards her. Ms. Gossett believed she and other African American females who attended Ms. McKinney's civil service hearing suffered from retaliation. Ms. Gossett complained she was not offered the opportunity to compete for a housing inspector position when she was on medical leave. In addition, Ms. Gossett stated the city did "little" things to make her feel uncomfortable such as providing her with a vehicle that had a malfunctioning air conditioner. But Ms. Gossett acknowledged she raised those issues before the McKinney hearing and the city had resolved them. Ms. Gossett then stated she should be compensated at the same rate as the current housing inspector. However, Ms. Gossett admitted the city had sent her a draft settlement agreement to resolve the compensation issue.

Mr. O'Brien stated he had no involvement in the McKinney case, which he first heard about in 2008. He has neither seen the witness list nor read Ms. McKinney's deposition. Mr. O'Brien was not aware plaintiffs were identified as witnesses in the McKinney matter.

In mid-2007, Mr. Pathirana asked Mr. O'Brien to prepare a job description for a Section 8 housing fraud investigator. The first candidate for the fraud investigator position could be appointed without opening up the position to a competitive recruitment process. Mr. Pournamdari appointed Roberto Chavez to the position with Mr. Pathirana's approval. In 2008, Mr. O'Brien met with Mr. Chavez about Mr. Chavez's investigation of plaintiffs. Mr. O'Brien did not think there was enough evidence to take disciplinary action but he did not review the criminal report prepared by Mr. Chavez and Sergeant Romero. He did not speak to the district attorney's office about plaintiffs and received a copy of the criminal complaint against plaintiffs after it had been filed in court. On March 26, 2009, Mr. O'Brien sent each plaintiff a letter suspending them without pay based on the criminal charges filed by the District Attorney.

The city also submitted a certified copy of the March 17, 2009 felony complaint alleging 11 counts against plaintiffs, Carolyn Hernandez, Herlinda Gonzales and Virginia

9

Anna Molina. At the preliminary hearing, the trial court dismissed all but three of the counts. On August 5, 2010, the criminal case was dismissed based on: "Delay- action not brought to court in time. The People cannot announce ready for trial. The People do not have witnesses and their witnesses have not been served."

In opposition to the city's summary adjudication, plaintiffs submitted various declarations and deposition testimony. Plaintiffs submitted Cheryl Williams' two discrimination complaints against the city as "me too" evidence. Ms. Williams was an African American female housing department employee. Ms. Williams complained she was harassed by a white housing director, Harold Roth. The trial court sustained defendant's objections to these two complaints based on hearsay.

Plaintiffs also submitted Ms. McKinney's declaration in opposition to defendant's motion. Ms. McKinney was an African American female employee who worked for the city for 19 years. She was a legal secretary for the city's planning department. On June 20, 2006, the city terminated her by eliminating her position. Ms. McKinney filed complaints against Mr. Roth and the city for racial discrimination, harassment and retaliation. In addition, plaintiffs submitted Ms. Kinney's age, race and gender discrimination complaints with the EEOC and the Department of Fair Employment and Housing (DFEH),as well as her civil action complaint. The trial court sustained defendant's objection to Ms. McKinney's DFEH and EEOC discrimination complaints based on hearsay.

In addition, plaintiffs submitted trial testimony from Twanna Manago in the McKinney action as "me too" evidence. Ms. Manago is an African American female employee who works in the finance department as a senior account clerk. Ms. Manago made daily complaints to her union representative about the everyday harassment she and other African American co-workers faced at work. Ms. Manago never filed a grievance because she feared Mr. Pathirana would retaliate against her. The trial court sustained the defendants' objection to Ms. Manago's testimony based on relevance.

Plaintiffs also submitted a declaration from Ms. Gossett. In her declaration, Ms. Gossett stated on August 9, 2006, she made a formal written complaint of gender, race

10

and disability discrimination to Mr. Pathirana, Mr. O'Brien and Mr. Pournamdari which was settled on April 24, 2007. In January 2007, Ms. Gossett attended a meeting with Congresswoman Maxine Waters and three other African American co-workers, Rose McKinney, Twanna Manago and Quila Lewis. In February 2007, Ms. Gossett met with Mr. O'Brien to discuss the racial discrimination, harassment and retaliation claims she made to Congresswoman Waters. Before Ms. Gossett was suspended on March 26, 2009, she agreed to testify in Ms. McKinney's case.

In addition, plaintiffs submitted Ms. Gossett's deposition in support of their summary adjudication opposition. Ms. Gossett testified she assisted Ms. Mack with the waiting list in April 2007. Mr. Pournamdari asked Ms. Gossett and Ms. Mack to give vouchers to applicants on the waiting list even though they told him the waiting list was not ready. Ms. Gossett stated she inspected the apartment unit that Mr. Chavez and Sergeant Romero claimed was not inspected. Someone coming out of the apartment building held the door open for Ms. Gossett because she was wearing her city shirt. Once inside the building, Ms. Gossett was able to access the unit because the carpet cleaners had been at the apartment and left the door open. Ms. Gossett felt she was retaliated against because Mr. Pathirana had fired her and it was "a kick to his ego" when he had to rehire her. Ms. Gossett asserted Mr. Chavez tried to make an African American female employee, Alvenia Nunley, "look bad" by complaining to Mr. Pournamdari that Ms. Nunley was not doing her work. In addition, Ms. Gossett stated Mr. Chavez treated another African American female housing specialist, Avater Winbourne, inappropriately by "always scrutinizing her work." Ms. Gossett testified Ms. McClanahan was "forced out" and sent home without pay after she had an argument with Mr. O'Brien. She also stated Tonya Harris, a housing department employee, was laid off by the city.

Plaintiffs also submitted Ms. Mack's deposition in support of their summary adjudication opposition. Ms. Mack stated Mr. Chavez referred to African American people as "those people" a few times when discussing African American housing applicants. In addition, Mr. Chavez assumed Ms. Mack knew or was related to an African American client simply because she struck up a conversation with that person.

11

Ms. Mack stated she and Ms. Gossett were compiling the 2007 waiting list when Mr. Pournamdari told them to issue vouchers to applicants on the waiting list. Ms. Mack inquired whether Mr. Chavez would have a problem and Mr. Pournamdari replied "No." Ms. Mack stated Mr. Chavez tried to sabotage her work and get her fired by going through her files and breaking into her desk on one occasion. Ms. Mack repeatedly asked Mr. Pournamdari to be transferred out of the housing department because she was "tired of having to double-check" her work and "being harassed." Her requests were denied by Mr. Pathirana.

Ms. Mack believed only people who were friends with Mr. Pathirana got pay increases. Ms. Mack stated Mr. Chavez received a pay increase because the city created the fraud investigator position for him. Ms. Mack asserted no African Americans received any promotion or merit-based pay raises. Ms. Mack's and Ms. Gossett's requests for pay raises were denied by the city. Ms. Mack stated she, Alvenia Nunley, Tonya Harris, Ms. Gossett, Cheryl Williams and Quila Lewis were discriminated against because they did not have job security in the face of layoffs. In addition, Ms. Mack observed Mr. Pournamdari did not do anything when Ms. Winbourne complained to him about her conflicts with Mr. Chavez.

In addition, plaintiffs submitted Mr. O'Brien's deposition in their summary adjudication opposition. Mr. O'Brien was aware of two gender and race discrimination lawsuits brought by Rose McKinney and Cheryl Williams, two former African American female employees. In addition, Mr. O'Brien testified Ms. Gossett, Twanna Manago and Quila Lewis complained they were being treated differently because they supported Ms. McKinney in her civil service commission hearing. Mr. O'Brien acknowledged the city did not have a fraud investigator until 2007 and no one replaced Mr. Chavez after his position was eliminated from the city budget. Mr. O'Brien reviewed Mr. Chavez's first draft investigation report and thought the evidence was too weak to support the fraud allegations. Mr. O'Brien told Mr. Chavez he did not have reason to question Ms. Mack's integrity or to believe she did anything illegal. Mr. O'Brien also thought Mr. Chavez's second draft report did not contain sufficient evidence to support the fraud allegations.

12

Concerning plaintiffs' suspension, Mr. O'Brien was directed by Mr. Pathirana to inform plaintiffs they would be placed on unpaid leave because the district attorney had filed criminal charges against plaintiffs. Mr. O'Brien was not informed that criminal charges against plaintiffs were later dismissed.

Plaintiffs also submitted Mr. Pathirana's deposition in support of their summary adjudication opposition. Mr. Pathirana admitted he was served with Ms. McKinney's racial discrimination lawsuit as the city manager. He was identified as a witness in the McKinney case. Mr. Pathirana also attended Ms. McKinney's civil service hearing. He recalled seeing African American female employees Monica McClananhan, Keeva Phillips, and Twanna Manago at Ms. McKinney's civil service hearings. Mr. Pathirana did not remember seeing Ms. Gossett, Ms. Mack, or Quila Lewis at the hearing but he admitted he could not recall everyone that was there. Mr. Pathirana personally contacted Ms. McKinney to try to settle her case without going through their respective attorneys.

Mr. Pathirana acknowledged he had two conversations with Congresswoman Maxine Waters regarding complaints made by Ms. McKinney, Ms. Gossett, Ms. Lewis and Ms. Manago. He spoke with Congresswoman Waters for about fifteen to twenty minutes about each employee's specific complaints. Congresswoman Waters encouraged Mr. Pathirana to have a meeting with her staff, the city staff and the employees to resolve the complaints. Mr. Pathirana later had individual and group meetings with these employees and Mr. O'Brien.

Mr. Pathirana admitted the fraud investigator position was created with Mr. Chavez in mind at the suggestion of Sergeant Chris Cognac from the Hawthorne Police Department. He acknowledged he has been friends with Mr. Chavez for more than five years. Mr. Chavez reported on his investigation of plaintiffs to Mr. Pathirana about 20 times. Mr. Pathirana attended one meeting with Mr. Chavez, Sergeant Romero and Mr. O'Brien where Mr. Chavez and Sergeant Romero discussed their investigation. Mr. Pathirana and Mr. O'Brien were not convinced there was sufficient evidence to support the fraud allegations against plaintiffs. Mr. Pathirana instructed Sergeant Romero and Mr. Chavez to gather more evidence before he would "give them the okay to present it to

13

the district attorney's office." At the final meeting, Mr. Pathirana either made the decision or was told that the investigation would be reported to the district attorney's office. Mr. Pathirana admitted he was terminated by the city in 2010. Sometime after Mr. Pathirana's termination, the city eliminated Mr. Chavez's position.

Plaintiffs also submitted Mr. Pournamdari's deposition in their summary adjudication opposition. Mr. Pournamdari stated Mr. Chavez did not apply for the fraud investigator position. Mr. Pournamdari promoted Mr. Chavez from housing specialist to fraud investigator. Mr. Pournamdari testified Mr. Chavez reported that Ms. Mack had issued Mr. Sanusi a voucher without completing the background check. Mr. Pournamdari contacted Ms. Mack and Ms. Mack stated she kept the paperwork in a different file. He testified Mr. Chavez later raised concerns about Mr. Sanusi's placement on the waiting list, moving from number 408 to the top of the list. Mr. Pournamdari admitted it was possible for an applicant to move from number 408 up to the top of the list in a four or five year period if other applicants were no longer eligible for Section 8 benefits. Mr. Sanusi was issued a voucher but he never became a Section 8 tenant. Mr. Pournamdari acknowledged Ms. Mack complained to him about Mr. Chavez's interference with her work.

Mr. Pournamdari oversaw the waiting list but did not work on the list. Ms. Mack was in charge of updating the waiting list. She was assisted by Ms. Gossett and Alvenia Nunley, an office clerk. The housing department opened the waiting list when there were not enough people to meet the Section 8 qualifications. He acknowledged Mr. Chavez never proved Ms. Gossett or Ms. Mack received gifts from any Section 8 applicant. Mr. Pournamdari had no personal knowledge that Ms. Mack or Ms. Gossett forged any documents or presented any false documents to benefit a potential tenant. After criminal charges were filed against plaintiffs, Mr. Pathirana called Mr. O'Brien and Mr. Pournamdari into his office. Mr. Pathirana stated plaintiffs would be placed on administrative leave because criminal charges had been filed against them. Mr. O'Brien later notified Mr. Pournamdari that Ms. Gossett and Ms. Mack were terminated.

14

Finally, plaintiffs submitted the deposition of Sergeant Romero in opposition to the summary adjudication. Sergeant Romero agreed he did not trust Mr. Pathirana or Mr. O'Brien with confidential information during his investigation of plaintiffs. He acknowledged Ms. Mack's daughter did not receive Section 8 benefits. Sergeant Romero did not know whether Ms. Mack received any monetary gifts from applicants. Sergeant Romero acknowledged his investigation of plaintiffs was based in part on statements made by Mr. Mayorga and Ms. Linares. He admitted Mr. Mayorga was a convicted felon who had a domestic violence history. But Sergeant Romero believed Mr. Mayorga's assertion that Ms. Mack had accepted bribes and gifts. Sergeant Romero acknowledged Ms. Linares and Mr. Mayorga committed Section 8 fraud because Mr. Mayorga was not supposed to live in the Section 8 housing. He admitted Ms. Linares was not prosecuted because she was deemed a percipient witness. Also, Ms. Linares decided not to give a gift card to Ms. Mack because Ms. Mack was rude to her. Sergeant Romero stated there was talk that the going rate was $500, but he never had tangible proof that Ms. Mack received any money. Sergeant Romero also acknowledged Ms. Linares stated that another employee named Sylvia later helped her with the Section 8 application. But Sergeant Romero did not interview other housing department employees to determine whether they helped Ms. Linares. Sergeant Romero was unable to interview Alvenia Nunley, another African American housing employee, so he was not aware she had assisted in processing the Section 8 applications.

## C. Summary Adjudication Hearing and Ruling

At the summary adjudication hearing, plaintiffs argued "me too" evidence from seven other African American female employees was circumstantial evidence of the city's race and gender discrimination. The trial court rejected plaintiffs' argument stating the complaints contained allegations, not evidence of discrimination. The trial court denied the city's motion as to plaintiffs' retaliation claim.

15

But the court granted the city's summary adjudication motion as to plaintiffs' claims for race, gender, and disability discrimination, hostile work environment, and race, gender and disability harassment. The trial court ruled plaintiffs failed to raise a triable issue of material fact as to the existence of racially discriminatory intent. Plaintiffs cited evidence that Mr. Chavez routinely referred to African Americans as "those people" but there was no supporting evidence for this statement and such remarks did not constitute evidence of discriminatory intent. The trial court found plaintiffs failed to provide evidence of gender-based discriminatory intent. In addition, the trial court found plaintiffs failed to provide evidence of disability-based discriminatory intent.

Finally, the trial court held there was insufficient evidence to raise a triable issue of material fact as to whether Mr. Chavez created a hostile work environment by harassing African Americans on the basis of their race. Ms. Mack's complaint that Mr. Chavez "attacked the character" of African American employees Avater Winbourne, Ms. Gossett, Alvenia Nunley and Peter Ojo was opinion without supporting evidence. In addition, evidence that Mr. Chavez referred to African Americans as "those people" and his assumption that Ms. Mack knew or were related to African American clients she conversed with were insufficient evidence of a hostile work environment. Also, the trial court found that Ms. Mack's testimony that she caught Mr. Chavez going through her files and trying to break into her desk was not evidence of racial animus.

## D. Motions in Limine

The parties made several motions in limine before trial. Plaintiffs sought to exclude evidence of any reference to Ms. McKinney's prior settlement of her racial discrimination and retaliation lawsuit against the city in motion in limine no. 2. In opposition to the motion, the city proposed limiting reference to Ms. McKinney's settlement to the following: Ms. McKinney had a hearing before the civil service commission to appeal her layoff from the city; Ms. McKinney filed a lawsuit alleging racial discrimination; the case was settled without an admission of liability; and the

16

parties settled on February 2, 2009. At the hearing, the trial court granted the motion limiting the testimony of the McKinney case as proposed by defendants.

In addition, the trial court granted several of the city's motions in limine. The court granted the city's motion in limine no. 3 by excluding all evidence of allegations of unlawful conduct more than one year prior to plaintiffs' claims with the DFEH. Also, the trial court granted the city's motion in limine no. 4. The court excluded evidence concerning allegations that the city or Mr. Pathirana misappropriated Department of Housing and Urban Development (HUD) money. The trial court also granted the city's motion in limine no. 8 by excluding "me too" evidence of discrimination complaints by third parties. But the trial court denied the city's motion in limine no. 12, which sought to exclude allegations or events not alleged or referred to in the First Amended Complaint.

### E. Trial Evidence for Retaliation Claim

At trial, the parties stipulated Ms. McKinney's deposition was taken on April 16, 2008 and transcribed on May 3, 2008. They further stipulated the McKinney litigation settled on January 19, 2009 and the settlement agreement was executed on February 2, 2009. During plaintiffs' case, they presented testimony from Ms. Mack, Ms. Gossett, Ms. McKinney, Mr. O'Brien, Mr. Pathirana, Mr. Pournamdari, and Sergeant Romero.

Ms. Mack testified she worked for the city as a housing specialist. In April 2007 she worked on the Section 8 waiting list under the direction of Mr. Pournamdari. Ms. Gossett assisted her with the waiting list. In early January 2007, Ms. Mack was informed by Mr. Pournamdari that Mr. Chavez had accused her of improperly issuing a voucher to Mr. Sanusi. Ms. Mack wrote Mr. Pournamdari a January 9, 2007 memo responding to the accusation and gave the Sanusi file to Mr. Pournamdari at his request. Mr. Pournamdari reviewed the Sanusi file and was satisfied that all the documents were in the file. But two weeks later, Mr. Pournamdari asked Ms. Mack for the Sanusi file and a summary of how she handled the file. Mr. Pournamdari again told Ms. Mack that

17

everything was fine and there was no missing documentation. Ms. Mack later was questioned about Mr. Sanusi's placement on the waiting list by Sergeant Romero in December 2008. Ms. Mack explained Mr. Sanusi moved from number 408 on the 2004 waiting list towards the top of the 2007 waiting list after Ms. Mack purged the 2004 waiting list at Mr. Pournamdari's request. Mr. Sanusi was issued a voucher but never used it. Ms. Mack denied ever taking any bribe or gift in exchange for a Section 8 voucher. After her meeting with Sergeant Romero and Mr. Chavez, Ms. Mack was placed on paid administrative leave by Mr. O'Brien. On March 26, 2009, the city suspended Ms. Mack without pay and benefits pending the outcome of the investigation.

Ms. Mack testified she knew Rose McKinney who was a secretary at the city's planning department. Ms. McKinney is African American. Ms. Mack attended two sessions of Ms. McKinney's hearing before the civil service commission. She saw Mr. Pathirana and Mr. O'Brien at Ms. McKinney's civil service commission hearing. Ms. Mack testified Mr. Pathirana made eye contact with her at the hearing. She later agreed to testify as a witness at the McKinney trial in the summer of 2008.

Ms. Gossett testified she worked for the city as a Section 8 housing inspector. In April 2007, Ms. Gossett assisted Ms. Mack with the Section 8 waiting list by inputting the application data into the computer system. They were assisted by housing department employees Cynthia Rodarte and Alvenia Nunley. Mr. Pournamdari instructed them to give waiting list preference based on the date and time the applications were submitted.

Ms. Gossett testified she complained to Mr. Pournamdari about Mr. Chavez's harassment of her which began in July 2006. Mr. Chavez harassed her by "always looking over [her] shoulder." Ms. Gossett also complained about Mr. Chavez going through Ms. Mack's files.

On December 3, 2008, Sergeant Romero questioned Ms. Gossett about a Section 8 unit that the owner alleged had not been inspected by Ms. Gossett. Ms. Gossett testified she inspected the unit. The owner, Jacqueline Kelly, saw Ms. Gossett on the premises but did not know how Ms. Gossett got into the unit because it was in a gated community. Ms. Gossett explained someone let her inside because she wore a city shirt. She was able

18

to enter the unit because the door was open for the carpet cleaners. Ms. Gossett questioned why Ms. Kelly would complain after she had already received Section 8 rent for fourteen months. Ms. Gossett testified Sergeant Romero also asked her whether she accepted bribes. She denied taking any bribe in exchange for a housing voucher or moving anyone up the waiting list.

After her interview with Sergeant Romero, Ms. Gossett was placed on paid administrative leave. On March 5, 2009, Ms. Gossett received a letter from Sergeant Romero stating that a criminal complaint had been filed against her. On March 26, 2009, Ms. Gossett was suspended without pay.

Ms. Gossett testified she was aware Ms. McKinney had filed a lawsuit against the city. Ms. Gossett was listed as a trial witness in the McKinney case. Ms. Mack was identified as "Maudrey Mack" in the joint list of trial witnesses in the McKinney action. The trial witness list was filed with the court on December 23, 2008.

Ms. McKinney testified she worked for the city for 18 years, from 1988 until 2006. She was a legal secretary for the planning and community development department for ten years until her layoff in May 2006. After the civil service commission hearing concluded, Ms. McKinney challenged her termination by filing a discrimination lawsuit against the city. She identified Ms. Mack and Ms. Gossett as witnesses for her January 20, 2009 trial. Ms. McKinney's case later settled before trial. The city settled the McKinney lawsuit without admitting liability.

Mr. O'Brien testified he became the city's human resources manager in March 2002. Mr. O'Brien stated he attended Ms. McKinney's hearing before the civil service commission. The hearing began in September 2006 and concluded in February 2007. He did not recall seeing Ms. Mack or Ms. Gossett at the McKinney hearing. Mr. Pathirana notified Mr. O'Brien that plaintiffs would be placed on paid administrative leave because of ongoing administrative and criminal investigations of plaintiffs. In early December 2008, Mr. O'Brien informed plaintiffs they would be placed on administrative leave. Mr. O'Brien did not recall whether he knew about Ms. McKinney's race discrimination and retaliation lawsuit at the time he placed plaintiffs on leave. In March

19

2009, Mr. Pathirana directed Mr. O'Brien to place plaintiffs on unpaid leave after the Los Angeles district attorney filed felony charges against plaintiffs.

Mr. O'Brien saw Mr. Chavez's draft investigation report a few weeks after plaintiffs were placed on paid administrative leave. Mr. O'Brien told Mr. Chavez the information was difficult to follow and insufficient to support the fraud allegations against plaintiffs. He reviewed Mr. Chavez's subsequent draft and thought the report was "still weak." However, Mr. O'Brien never reviewed Sergeant Romero's report concerning his investigation of plaintiffs.

Mr. Pathirana testified he was the city manager from June 2006 to May 2010. He was in charge of the city's day-to-day operations under the city council's direction. Mr. Pathirana testified after Ms. McKinney's position was eliminated, she appealed to the civil service commission. He attended the McKinney civil service commission hearing but did not remember whether Ms. Mack or Ms. Gossett were present at the hearing. Mr. Pathirana testified Ms. McKinney filed a lawsuit after the civil service commission hearing.

Mr. Pathirana created the fraud investigator position upon the recommendation of Sergeant Chris Conrad from the Hawthorne Police Department. Mr. Chavez was selected for the fraud investigator position because he was already doing housing fraud investigations. In addition, Sergeant Conrad recommended Mr. Chavez for the position. Mr. Pathirana acknowledged he and Mr. Chavez were very good friends.

Mr. Pathirana was aware of Mr. Chavez's investigation of plaintiffs but denied monitoring the investigation. He reviewed some reports from Mr. Chavez concerning the investigation. Mr. Pathirana had two meetings with Sergeant Romero where he was informed of the status of the investigation. Sergeant Romero sent Mr. Pathirana a letter on December 17, 2008 regarding the status of his criminal investigation of plaintiffs. Mr. Pathirana stated criminal charges went forward to the district attorney's office because Sergeant Romero and Mr. Chavez believed they had sufficient evidence. The criminal charges against plaintiffs were later dismissed.

20

Mr. Pournamdari testified he became the director of the housing department in 2005. He is in charge of the day-to-day operation of the housing department and handles Section 8 funding from the federal government. He was Ms. Mack's and Ms. Gossett's supervisor. In 2007, Mr. Chavez informed Mr. Pournamdari that Mr. Sanusi's file was missing a document. Mr. Pournamdari asked Ms. Mack about the missing background check and was told the police department never sent back the information. Later, the police department sent back the background check. Mr. Pournamdari acknowledged Ms. Mack complained about Mr. Chavez looking through her files. Mr. Chavez also reviewed Mr. Sanusi's placement on the waiting list. Ms. Mack was in charge of the waiting list with assistance from Ms. Gossett. Mr. Pournamdari oversaw the waiting list maintained by Ms. Mack. Mr. Pournamdari set the waiting list preference based on city residence and the date and time of the Section 8 application submissions. He admitted a Section 8 applicant like Mr. Sanusi could move up because the waiting list was purged of ineligible applicants every fifteen months. Mr. Sanusi received a voucher but did not received any Section 8 benefits.

Mr. Pournamdari testified Mr. Chavez informed him that an anonymous caller had accused plaintiffs of receiving gifts in exchange for helping people with Section 8 benefits. Mr. Chavez never showed Mr. Pournamdari any evidence that Ms. Gossett or Ms. Mack received money or gifts in exchange for Section 8 vouchers. Mr. Chavez also notified Mr. Pournamdari that an owner had complained Ms. Gossett did not inspect her unit. The owner also called Mr. Pournamdari to complain that her unit had not been inspected. Mr. Pournamdari spoke with Ms. Gossett and Ms. Gossett stated she had done the inspection. Later, Mr. Pournamdari attended a meeting with Mr. Pathirana, Mr. Chavez, and Sergeant Romero concerning the investigation of plaintiffs. At the meeting, Sergeant Romero decided to go forward with the criminal prosecution of plaintiffs. Mr. Pournamdari testified he was not involved in the decision to place plaintiffs on administrative leave.

Mr. Pournamdari was not aware of when the McKinney lawsuit was filed. He also did not know whether Ms. McKinney gave deposition testimony in her lawsuit. Also,

Mr. Pournamdari was not aware that plaintiffs were suspended without pay five weeks prior to Ms. McKinney's trial date. He also did not know that Ms. McKinney's trial date was January 20, 2009. He was not asked to be a witness in the McKinney case. And Mr. Pathirana did not tell him that he was a witness in the McKinney case.

Sergeant Romero testified he was assigned to the criminal abatement office known as the crime-free multi-housing unit. In early July 2008, Sergeant Romero was contacted by Mr. Chavez concerning a call from Rene Mayorga alleging Ms. Mack was involved in fraud. Mr. Mayorga called to report on his co-habitant, Idalia Linares, and her relatives because he had a falling out with them. Sergeant Romero admitted there was no physical evidence of bribery. But he believed there was circumstantial evidence of misconduct based on statements from Mr. Mayorga, Ms. Linares, Ms. Linares's relatives, and plaintiffs' inconsistent statements. Sergeant Romero stated Ms. Mack explained for the waiting list, "they inputted the data so that the numbers come out the way the wanted them to." Sergeant Romero also testified he believed Ms. Gossett filed a false inspection report because Ms. Kelly, the unit's owner, complained the unit had not been inspected.

Sergeant Romero was not aware that Ms. McKinney had filed a racial discrimination and retaliation lawsuit before the July 2008 investigation of plaintiffs. He did not know Ms. McKinney had identified plaintiffs as possible witnesses in her deposition prior to the July 2008 investigation. Sergeant Romero spoke with Mr. Pathirana twice about his investigation of plaintiffs. He also wrote a memorandum to Mr. Pathirana on December 17, 2008 regarding the investigation at the request of his police chief.

F. Nonsuit Motion and Ruling

The city made a motion for nonsuit at the end of plaintiffs' case. The city argued plaintiffs failed to establish a causal link between their support of Ms. McKinney's civil service commission hearing and discrimination lawsuit and the city's decision to suspend them. The trial court granted the city's nonsuit motion.

The trial court explained: "First of all, it's undisputed that Ms. McKinney's complaint was filed on September 5, 2007. Ms. Mack testified that the issue with regard to the waiting list and Mr. Sanusi's movement up the waiting list and Mr. Sanusi's file came up in January of 2007. [¶] She testified she was accused of issuing inappropriate vouchers to Mr. Sanusi, and Mr. Pournamdari went over the file with her. She claims that everything was determined to be okay at that juncture, but, nonetheless, the issue came up in January of 2007. [¶] Ms. Mack also testified that she agreed to appear as a witness on behalf of McKinney in the summer of 2008. We know that she also testified that she was present at the civil service commission hearing, that she made eye contact, allegedly twice, but that she did not, in fact, testify. . . . [¶] So putting the timing together, . . . the accusations against Ms. Mack with regard to the improper issuance of the voucher and the Sanusi file came up January 2007. That's eight months before Ms. McKinney's complaint was filed. . . . [¶] Ms. Gossett testified that she was made aware that she was being investigated in December of 2008. She was told to meet with Sergeant Romero. She testified that she knew Rose McKinney, and she was aware that Ms. McKinney had challenged her termination."

The trial court took judicial notice of the December 23, 2008 joint witness list submitted in the McKinney action. The witness list identified plaintiffs as trial witnesses. The trial court noted the investigation of plaintiffs occurred in early July 2008. The trial court found the investigation was legitimate and "not linked in any way by temporary proximity or anything that would allow the court to conclude there is any basis to find retaliation."

## III. DISCUSSION

### A. Summary Adjudication of Race and Gender Discrimination Claims

Summary judgment may be granted only if there is no triable issue of material fact and the party is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd.

(c).)  A defendant moving for summary judgment has the burden of presenting evidence that negates an element of plaintiff's claim or evidence that the plaintiff does not possess and cannot reasonably expect to obtain evidence needed to support an element of the claim.  (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460; *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)  If the defendant meets this burden, the burden shifts to the plaintiff to set forth "specific facts" showing that a triable issue of material fact exists.  (Code Civ. Proc., § 437c, subd. (p)(2).)

We review de novo the trial court's grant of summary judgment.  (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1039; *Lonicki v. Sutter Health Central* (2008) 43 Cal.4th 201, 206.)  We take the facts from the record that was before the trial court when it ruled on the motion and consider all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.  (*Ibid.;* Code Civ. Proc. § 437c, subd. (c).)  The court does not weigh the parties' evidence; rather, it must consider all the evidence and "all inferences reasonably deducible from the evidence."  (Code Civ. Proc. § 437c, subd. (c); *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 540-541; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 856.)  But our Supreme Court has stated, "any doubts as to the propriety of granting a summary judgment motion should be resolved in favor of the party opposing the motion."  (*Reid v. Google, Inc. supra,* 50 Cal.4th at p. 535; *Miller v. Bechtel Corp.* (1983) 33 Cal.3d 868, 874.)

The Fair Employment and Housing Act (FEHA) prohibits an employer from discriminating against an employee based on race, medical condition, or gender discrimination.  (Gov. Code § 12940, subd. (a).)  The court applies "a three-stage burden-shifting test" for discrimination claims.  (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354; *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.)  At trial, the plaintiff bears the initial burden of establish a prima facie case of discrimination or retaliation.  If the employee does so, a presumption of discrimination or retaliation arises.  (*Guz, supra,* 24 Cal.4th at p. 354; *Yanowitz, supra,* 36 Cal.4th at p. 1042.)  The burden then shifts to the employer to rebut the presumption by producing admissible evidence that its adverse employment action was taken for a legitimate, nondiscriminatory or

24

nonretaliatory reason.  (*Guz, supra,* 24 Cal.4th at p. 355-356; *Yanowitz, supra,* 36 Cal.4th at p. 1042.)  If the employer does so, the burden shifts back to plaintiff to "attack the employer's proffered reasons as pretexts for discrimination" or retaliation, or to offer other evidence of intentional discrimination or retaliation.  (*Guz, supra,* 24 Cal.4th at p. 356; *Yanowitz, supra,* 36 Cal.4th at p. 1042.)

A defendant moving for summary judgment may skip to the second step of the analysis by demonstrating it has a legitimate business reason, unrelated to race, gender, other protected classifications, or retaliation.  (*Guz v. Bechtel National Inc., supra*, 24 Cal.4th at p. 357.)  The plaintiff then has "the burden to *rebut* this facially dispositive showing by pointing to evidence which nonetheless raises a rational inference that intentional discrimination occurred."  (*Ibid.*)

### 1.  "Me Too" Evidence

Plaintiffs argue the trial court erred in granting summary adjudication of their race and gender discrimination claims.  Plaintiffs contend race and gender discrimination can be inferred because nine African American female employees— Ms. Williams, Ms. McKinney, Ms. Winbourne, Ms. McClanahan, Ms. Nunley, Ms. Lewis, Ms. Harris, Ms. Gossett and Ms. Mack— all complained of discrimination and retaliatory treatment.  Plaintiffs assert it was reversible error not to consider the "me too" evidence of discrimination from the other African American female employees.  They argue the "me too" evidence is relevant and admissible evidence under *Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 115 and *Johnson v. United Cerebral Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740, 747 *(Johnson)*.  We disagree.

We conclude the trial court properly excluded plaintiffs' "me too" evidence.  First, plaintiffs failed to present their "me too" evidence of the third party complaints in their separate statement of disputed facts.  Plaintiffs did not comply with Code of Civil Procedure § 437c, subdivision(b)(3), which requires plaintiffs to "'set forth plainly and concisely any other material facts that the opposing party contends are disputed.'"  Thus,

the trial court did not have to consider the "me too" evidence. (*Batarse v. Service Employees Intern. Union Local 1000* (2012) 209 Cal.App.4th 820, 828-829.) Second, plaintiffs do not challenge the trial court's exclusion of some of the "me too" evidence as hearsay including: Ms. Williams' and Ms. McKinney's discrimination complaints; Ms. William's declaration in the McKinney action; and Ms. Manago's trial testimony in the McKinney case. Only admissible evidence may be considered when determining whether there is a triable issue. (*Bozzi v. Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 761; *DiCola v. White Bros. Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 679-682.)

Finally, we disagree with plaintiffs' assertion that their "me too" evidence is relevant and admissible under *Johnson, supra,* 173 Cal.App.4th at p. 747 and *Pantoja v. Anton, supra,* 198 Cal.App.4th at p. 115. Both cases are distinguishable from the present case. In *Johnson,* plaintiff alleged she was terminated after she became pregnant. (173 Cal.App.4th at pp. 744, 746.) In opposition to summary judgment, plaintiff submitted declarations from former employees asserting they were fired when they became pregnant or knew someone who was fired because of pregnancy. (*Johnson, supra,* 173 Cal.App.4th at pp. 761-762.) All four employees who stated they were fired when they became pregnant worked at the same facility, had the same three supervisors, and were fired very shortly after their supervisors learned of their pregnancy. (*Johnson, supra,* 173 Cal.App.4th at p. 761 fn. 14.)

Likewise, plaintiffs' reliance on *Pantoja v. Anton, supra,* 198 Cal.App.4th at p. 115 is misplaced. In *Pantoja v. Anton*, plaintiff sued her employer for race and sex discrimination and sexual harassment. (198 Cal.App.4th at p. 93.) The trial court ruled, both before and during trial, that evidence of defendant's sexual harassment of other employees was admissible only if it took place in plaintiff's presence or affected her work environment. (*Pantoja v. Anton, supra,* 198 Cal.App.4th at p. 109.) The appellate court held it was error not to admit "me too" evidence of sexual harassment by defendant against other employees. (*Ibid.*) The "me too" evidence was relevant to prove defendant's intent when he used profanity and touched employees. (*Ibid.*) In addition,

defendant's sexual harassment of other employees was admissible to impeach defendant's credibility and to rebut factual claims made by defense witnesses. (*Id.* at p. 110.)

Here, plaintiffs presented the following "me too" evidence. Mr. Chavez constantly complained about Ms. Nunley's work to their supervisor, Mr. Pournamdari. In addition, Mr. Chavez constantly argued with Ms. Winbourne and scrutinized her work. Ms. Gossett testified Ms. McClanahan was "forced out" and sent home without pay after an argument with Mr. O'Brien. Tonya Harris, a housing department employee was laid off by the city. Also, Ms. McKinney complained about race and sex discrimination and harassment by her planning department supervisor, Mr. Roth.

We find the "me too" evidence lacks the factual and supervisory nexus present in *Johnson* and *Pantoja v. Anton.* Plaintiffs complained about Mr. Pathirana and Mr. Chavez's actions; Ms. McKinney complained about discrimination and harassment from a different supervisor, Mr. Roth. Also, evidence that Ms. McClanahan was "forced out" and Ms. Harris was laid off without more detail does not give rise to an inference of race and gender discrimination. In addition, Mr. Chavez's conduct towards Ms. Nunley and Ms. Winbourne has no bearing on Mr. Chavez's investigation of plaintiffs and Mr. Pathirana's subsequent decision to place plaintiffs on administrative leave. We conclude the trial court properly excluded the "me too" evidence.


2. Pretext


Plaintiffs assert the fraud investigation was a pretext for the city's race and gender discrimination and retaliation. They contend the city never established a legitimate, non-discriminatory reason for its investigation of plaintiffs. We disagree.

To avoid summary judgment, plaintiffs must offer substantial evidence that the city's stated nondiscriminatory reason was untrue or pretextual, or the city acted with discriminatory animus, or a combination of the two. (*Hersant v. Dept. of Social Services* (1997) 57 Cal.App.4th 997, 1004-1005; *Johnson, supra,* 173 Cal.App.4th at p. 755.) It is

27

not enough for plaintiffs to simply "show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." (*Hersant v. Dept. of Social Services, supra,* 57 Cal.App.4th at p. 1005; *Johnson, supra,* 173 Cal.App.4th at p. 755.)  Rather, "'[t]he [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' [citation], and hence infer 'that the employer did not act for . . . [the asserted] non-discriminatory reasons.' [Citations.]"  (*Ibid.*)

We conclude plaintiffs failed to rebut the city's proffered legitimate non-discriminatory reasons for the investigation and administrative leave.  Mr. Chavez received a telephone call from an informant, Mr. Mayorga, alleging Ms. Mack engaged in misconduct.  Mr. Chavez and Sergeant Romero conducted interviews of Mr. Mayorga, his girlfriend, Ms. Linares, and her relatives.  Ms. Linares implicated Ms. Gossett stating Ms. Gossett knew about the alleged scheme.  In addition, Mr. Chavez and Sergeant Romero investigated Ms. Gossett concerning her failure to inspect a Section 8 apartment after the landlord complained there had been no inspection.  Also, Ms. Mack was separately investigated as to Mr. Sanusi's placement on the waiting list because Mr. Chavez believed other applicants should have received a voucher before Mr. Sanusi. After Mr. Chavez and Sergeant Romero conducted their investigation, they presented their evidence to the district attorney's office.  The city later placed plaintiffs on administrative leave after the district attorney filed criminal charges against them.  The city's evidence on its face is sufficient to support summary adjudication of the discrimination claims.  (*Johnson, supra,* 173 Cal.App.4th at p. 756.)


B.  Nonsuit on Retaliatory Claim


"In reviewing a judgment of nonsuit, 'we must view the facts in the light most favorable to the plaintiff.  "[C]ourts traditionally have taken a very restrictive view of the

28

circumstances under which nonsuit is proper. The rule is that a trial court may not grant a defendant's motion for nonsuit if plaintiff's evidence would support a jury verdict in plaintiff's favor. [Citations.] [¶] In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor. . . .'" [Citation.] The same rule applies on appeal from the grant of a nonsuit. [Citation.]' [Citation.]" (*O'Neil v. Crane Co.* (2012) 53 Cal.4th 335, 347; *Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214-1215.)

"[I]n order to establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. [Citations.] Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ""'drops out of the picture,'"" and the burden shifts back to the employee to prove intentional retaliation. [Citation.]" (*Yanowitz, supra,* 36 Cal.4th at p. 1042; *Kelley v. The Conco Companies* (2011) 196 Cal.App.4th 191, 209.)

Plaintiffs argue the nonsuit must be reversed. Plaintiffs assert the fraud investigation was linked by temporal proximity to plaintiffs being identified as witnesses in Ms. McKinney's racial discrimination and retaliation lawsuit. Plaintiffs contend the investigation occurred in June 2008, after Ms. McKinney identified them as witnesses in her April 16, 2008 deposition. And the investigation was conducted a few weeks after Ms. McKinney's deposition was transcribed on May 3, 2008. They assert of the four employees – Ms. Mack, Ms. Gossett, Ms. Nunley and Ms. Rodarte— that handled the waiting list, only they were investigated in June 1008 because they were McKinney

29

witnesses.  Furthermore, they were suspended on December 3, 2008, exactly 48 days before the January 20, 2009 McKinney trial date.  Plaintiffs' arguments are unpersuasive.

We conclude the trial court properly granted the nonsuit motion.  Ms. Mack testified she attended two sessions of Ms. McKinney's civil service commission hearing and made eye contact with Mr. Pournamdari.  But Mr. Pournamdari and Mr. O'Brien did not recall seeing either Ms. Mack or Ms. Gossett at the McKinney civil service commission hearing.

Also, plaintiffs assert the trial court improperly considered testimony concerning Ms. Mack's handling of the Sanusi file in January 2007.  They argue this evidence was precluded by the trial court's pretrial evidentiary ruling.  We disagree.  The trial court granted the city's motion in limine no. 3 by excluding all evidence of allegations of unlawful conduct more than one year prior to plaintiffs' claims with the DFEH.  But plaintiffs cannot complain about any error because they themselves introduced evidence that Ms. Mack's work was first investigated by Mr. Chavez and Mr. Pournamdari in January 2007.  They also presented testimony from Ms. Gossett that Mr. Chavez began to harass her in July 2006.

In addition, Sergeant Romero testified he began investigating plaintiffs in July 2008 after Mr. Chavez informed him about Mr. Mayorga's accusations.  Although, plaintiffs question Mr. Mayorga's credibility, it is undisputed Sergeant Romero and Mr. Chavez conducted the investigation independent of the McKinney lawsuit.  Also, it is undisputed Sergeant Romero and Mr. Chavez investigated Ms. Gossett because Ms. Kelly complained Ms. Gossett failed to inspect her Section 8 unit.  Sergeant Romero testified he was not aware of the McKinney lawsuit before he conducted the July 2008 investigation.  He also did not know Ms. McKinney had identified plaintiffs as possible witnesses in her deposition.  He was not aware of the McKinney litigation until after criminal charges had been filed against plaintiffs.  Likewise, Mr. Pournamdari did not know when the McKinney lawsuit was filed.  He also did not know about Ms. McKinney's deposition testimony in her lawsuit.  Also, Mr. O'Brien did not recall

30

whether he knew about Ms. McKinney's race discrimination and retaliation lawsuit at the time he placed plaintiffs on leave.

The trial court did not err in finding plaintiffs failed to establish a prima facie case of retaliation. Plaintiffs failed to show a causal link between the protected activity of being witnesses in a discrimination case and the fraud investigation.

## C. Evidentiary Objections

We review a trial court's evidentiary rulings, including motions in limine to exclude evidence, for an abuse of discretion. (*County of Glenn v. Foley* (2012) 212 Cal.App.4th 393, 398; *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281.) "This is particularly so with respect to rulings that turn on the relevance of the proffered evidence. [Citation.] This standard is not met by merely arguing that a different ruling would have been better. Discretion is abused only when in its exercise, the trial court 'exceeds the bounds of reason, all of the circumstances before it being considered.' [Citation.]" (*Shaw v. County of Santa Cruz, supra,* 170 Cal.App.4th at p. 281.) Moreover, "[i]t is for the trial court, in its discretion, to determine whether the probative value of relevant evidence is outweighed by a substantial danger of undue prejudice. The appellate court may not interfere with the trial court's determination . . . unless the trial court's determination was beyond the bounds of reason and resulted in a manifest miscarriage of justice." (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 596.) The appellants have the burden of establish an abuse of discretion. (*Shaw v. County of Santa Cruz, supra,* 170 Cal.App.4th at p. 281.)

We conclude the trial court's evidentiary rulings were not an abuse of discretion. The trial court limited testimony regarding the McKinney lawsuit to the following: Ms. McKinney had a hearing before the civil service commission to appeal her layoff from the city; Ms. McKinney filed a lawsuit alleging racial discrimination and retaliation; the case was settled without an admission of liability; and the parties settled on February 2, 2009. Plaintiffs argue it was error to exclude testimony concerning: McKinney's

31

complaints to Mr. Pathirana of racial discrimination; Mr. Pathirana's termination of Ms. Kinney; Ms. McKinney's civil service hearing where Mr. Pathirana "stared down" Ms. Mack to intimidate her; Mr. Pathirana's attempt to settle the lawsuit with Ms. McKinney; Ms. McKinney's and Ms. Gossett's meeting with Congresswoman Waters; and Mr. Pathirana's investigation of Congresswoman Waters' complaint. In addition, they challenge the trial court's exclusion of evidence concerning allegations that the city or Mr. Pathirana misappropriated HUD money. Plaintiffs do not explain how the excluded evidence is relevant to their retaliation claim.

Plaintiffs also challenge the trial court's exclusion of evidence of allegations of unlawful conduct more than one year prior to plaintiffs' claims with the DFEH. We find no error. The time limit for filings claims with the DFEH is one year from the alleged unlawful act. (Gov. Code § 12960, subd. (d) ["No complaint may be filed after the expiration of one year from the date upon which the alleged unlawful practice or refusal to cooperate occurred . . ."]) Any alleged violation that occur one year before the filing of plaintiffs' DFEH complaints is barred by the statute of limitations. (*Cucuzza v. City of Santa Clara* (2002) 104 Cal.App.4th 1031, 1040; *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 63.)

Furthermore, plaintiffs argue it was error to exclude "me too" evidence of discrimination complaints by third parties. Plaintiffs fail to demonstrate why the "me too" evidence is admissible and relevant to their retaliation claim.

Finally, plaintiffs take issue with numerous trial evidentiary rulings. However, plaintiffs present no legal argument in support of their evidentiary objections. In addition, they do not explain why and how any error caused harm. We find no abuse of discretion.

## IV.  DISPOSITION

We affirm the summary adjudication and nonsuit orders and judgment.  We also affirm the evidentiary exclusion orders.  Costs on appeal are awarded to defendant, City of Hawthorne.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

O'NEILL, J.[*]

We concur:

TURNER, P. J.

KRIEGLER, J.

---

[*]  Judge of the Ventura County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

33